Ronald W. Messerly (SBA No. 020582)
*rmesserly@swlaw.com*
Benjamin M. Mitsuda (SBA No. 024744)
*bmitsuda@swlaw.com*
SNELL & WILMER L.L.P.
Cooperating Attorneys, ACLU Foundation of Arizona, Inc.
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
Telephone: (602) 382-6000

Daniel J. Pochoda (SBA No. 021979)
*dpochoda@acluaz.org*
Legal Director
ACLU Foundation of Arizona
P.O. Box 17148
Phoenix, AZ  85011-0148
Telephone:  (602) 650-1854

Attorneys for Plaintiff Eman A. Mabrouk

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EMAN A. MABROUK,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH M. ARPAIO, Sheriff of Maricopa County, Arizona, in his individual and official capacities; COMMANDER HANK DEAN, in his individual and official capacities; SERGEANT JOHN DOE, in his individual capacity; and MARICOPA COUNTY, ARIZONA, a body politic,<br><br>Defendants. | No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>(Violation of Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq.; Violation of First Amendment of the United States Constitution, 42 U.S.C. § 1983; Violation of Arizona State Constitution, art. 20, § 1; Violation of the Arizona Free Exercise of Religion Act, A.R.S. §§ 41-1493 to 1493.02) |

## **INTRODUCTION**

1.    By this Complaint, Plaintiff Eman A. Mabrouk, through her counsel, requests relief for the harms resulting from the substantial burdens that Defendants, their officers and agents unlawfully imposed on the practice of her religion *and* to deter

10098085

Defendants from engaging in religious discrimination. Eman is a practicing Muslim American who was denied the right to wear her religious headcovering by Defendants when she was booked at the Maricopa County Jail. The need to make reasonable accommodations for the religious beliefs of detainees is a well established constitutional right and is required under federal and state statutes.

## JURISDICTION AND VENUE

2. This action arises under 42 U.S.C. § 1983, the laws and Constitution of the United States, and the laws of the State of Arizona. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 2000cc-2(a), and directly under the Constitution. This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367(a).

3. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

4. As to the state law claims set forth herein, a notice of claim pursuant to A.R.S. § 12-821.01 was timely served on Defendants and was deemed denied by operation of statute.

## PARTIES

### Plaintiff

5. Eman is a 21-year old practicing Muslim woman who resides in Maricopa County, Arizona. She recently graduated from South Mountain Community College and will be a student at Arizona State University starting in the fall of 2009.

### Defendants

6. Defendant Joseph M. Arpaio is the duly elected Sheriff of Maricopa County, Arizona ("Arpaio"). He is an officer of Maricopa County and is responsible for the policies and practices in the Maricopa County Jails, including during intake. Defendant Arpaio is the final decision maker for Maricopa County for polices and practices in the County Jails, including during intake. He is sued in his individual and official capacities.

7. Defendant Hank Dean is a Commander ("Dean") with the Maricopa County Sheriff's Office ("MCSO") who held supervisory authority over intake practices and procedures at the Fourth Avenue Jail on the date of the events that form the basis for this Complaint. He is an employee of Maricopa County. He is sued in his individual and official capacities.

8. Defendant John Doe is a Sergeant with the MSCO who directed the intake and booking of Eman at the Fourth Avenue Jail in the early morning hours of September 25, 2008. Eman is not aware of the true name of Sergeant John Doe, and therefore names him under a fictitious name. On information and belief, he is an employee of Maricopa County. Sergeant John Doe is sued in his individual capacity.

9. All of the individual defendants acted under color of law during the events described below.

10. Defendant Maricopa County, Arizona, is a public entity formed and designated as such pursuant to Title 11 of the Arizona Revised Statutes (the "County"). The County is liable for the practices and policies of Defendant Arpaio and responsible for all actions of the officers, agents, and employees of the County, including each of Defendants Arpaio, Dean, and Doe.

11. MCSO is a department or other instrumentality of the County. On information and belief, the MCSO receives federal financial assistance as well as financial assistance from the State of Arizona.

## FACTUAL ALLEGATIONS

### Plaintiff's Religious Practice of Wearing a Headscarf

12. Muslim women wear a headscarf, also known as a hijab or khimar, in accordance with their religious beliefs. These beliefs are based on the Koran (Qur'an), the primary holy book of the Muslim religion, the *hadith* (or *ahadith*), oral traditions coming from the era of the Prophet Mohammed, and other religious texts and interpretations.

13. As part of her religious faith and practice, Eman wears a headscarf, covering her hair, ears, and neck when she is in public and when she is at home, if she is in the presence of men who are not part of her immediate family. She has worn a headscarf continuously since she was in the second grade.

14. To Eman, wearing a headscarf is a requirement of her faith and religious obligations. It is needed because of the importance of modesty in her religion, and symbolizes her control over who may see any uncovered parts of her body. To have her hair and neck uncovered in public, particularly in the presence of men, is a serious breach of faith and religious practice, and a deeply humiliating, hurtful and defiling experience that violates her religious laws and traditions and causes great harm and distress.

**Plaintiff's Arrest and Transfer of Custody to the MCSO**

15. On the evening of September 24, 2008, officers from the Chandler Police Department visited the home of Eman's parents in Chandler, AZ, seeking to take Eman in for questioning about an incident that had taken place in Phoenix.

16. Eman was taken in the officers' patrol car, while her parents followed in their car. The officers brought Eman to the parking lot of Fry's Electronics in Tempe where she was transferred to the custody of the Phoenix Police Department. The officers with the Phoenix Police Department directed her to leave her personal effects with her parents, including some jewelry and a hair-tie that she had been wearing in her hair. Neither the officers from Chandler nor those from Phoenix required Eman to remove her headscarf.

17. Eman was transported to the Desert Horizon precinct office in Phoenix where she had her photograph taken for identification; this was done with her headscarf on. Eman was then brought to the Fourth Avenue Jail for booking.

**Plaintiff's Intake and Booking at Fourth Avenue Jail**

18. Eman arrived at the Fourth Avenue Jail sometime after midnight. Shortly after arriving, she requested a meal.

19. As Eman waited in the booking area, Sergeant John Doe informed her in a loud voice—so that others in the area could hear—that she could have a meal, but that she was going to have to take "that thing off your head."

20. When it came time for her photograph to be taken, Sergeant John Doe again ordered her to remove her headscarf. Eman explained that she could not. The Sergeant approached Eman and, coming within a few inches of her face, told her that if she did not take it off, he would take it off *for* her. He stated that she "may read the Koran" but that when in the jail "you follow my law."

21. As demonstrated by his words, the Sergeant was aware that the wearing of the headscarf was based on the Koran and religious belief.

22. On information and belief, all the Defendants knew that the wearing of head coverings is a religious requirement for many persons, including Muslims and Jews.

23. The Sergeant then asked Eman where she was from. She replied, "Brooklyn." He responded, "Exactly—the United States of America." Throughout the exchange, the Sergeant directed cuss words at Eman and would cut her off, not allowing her to continue speaking.

24. Eman was required to remove her headscarf. As she did, those in the vicinity of the booking area, including many men, turned to look at her. Eman felt shamed and exposed, and those feelings remain with her many months later.

25. Upon information and belief, other persons booked at the Fourth Avenue Jail were permitted to retain their religious head covering throughout intake and after booking, including Jewish men wearing yarmulkes.

26. The Sergeant took Eman's headscarf away from her and the booking photograph was taken. A female officer patted down Eman and searched under her shirt. No contraband or weapon was found, and Eman was placed in a holding cell with other women.

27. Neither Sergeant John Doe, nor any other personnel present, provided Eman with a substitute head covering for the photograph or afterwards when she was placed in the holding cell.

28. In the holding cell, Eman pulled the hood of the sweatshirt she was wearing over her head in an attempt to cover herself and comply with her religious requirements. She remained that way for many hours until the next afternoon, when it was time for her to see a judge.

29. After her arraignment, Eman was given back her headscarf and released from the jail. She then called her parents to come pick her up. It was approximately 7:30 in the evening.

30. After she left the jail, Eman broke down and began to cry. She experienced bouts of crying for several weeks afterwards, and saw a counselor to help her make sense of what happened. Eman felt that her religious identity and her personal integrity had been attacked, and she was publicly humiliated. She suffered, and continues to suffer, extreme shame, humiliation, mental anguish, and emotional distress as a result of the Defendants' actions.

### Defendants' Practices and Culpability

31. Defendants prohibited Eman from wearing her religious headscarf pursuant to the practice, policy or custom of Defendant Arpaio and Defendant Maricopa County. This practice, policy or custom was implemented by Defendant Dean. Defendants Arpaio and Dean required or knowingly approved of Defendant John Doe's prohibition on Muslim women wearing their religious headscarves during intake, including in the presence of men.

32. In the days following the above incident, Deedra Abboud, a Muslim community advocate, attempted to find out why Eman was required to remove her headscarf. Ms. Abboud was told by MCSO personnel that it was done as a matter of MCSO "policy."

33. On September 25, 2008, Defendant Arpaio was responsible for all of the personnel, practices and policies at the Fourth Avenue jail and Defendant Dean directed the intake practices at the Fourth Avenue Jail and supervised the personnel conducting intake including Sergeant John Doe and the other officers who had contact with Eman.

34. Defendants Arpaio and Dean did not require nor allow alternative head coverings to be provided to Muslim women. Defendants Arpaio and Dean were aware that religious practices of some detainees required the wearing of head coverings at all times in public, and that the MCSO had to make reasonable accommodation for religious beliefs of detainees. On information and belief, MCSO employees including John Doe were not properly trained or supervised by Defendant Arpaio nor Defendant Dean to accommodate the religious beliefs of persons during intake or detention. On information and belief, Defendant Arpaio and Defendant Dean failed to train MCSO employees, including John Doe, regarding the great mental and emotional distress that the inability to practice these deeply held beliefs would predictably cause.

35. In contrast to the Defendants' policy, custom, or practice prohibiting the use of religious headcoverings, the Federal Bureau of Prisons has enacted a policy regarding "religious headwear" providing that "[s]carves and headwraps (hijabs) are appropriate for female inmates . . . ." U.S. Dep't of Justice, Federal Bureau of Prisons, Program Statement re: Religious Beliefs and Practices (Dec. 31, 2004), available at http://www.bop.gov/policy/progstat/5360_009.pdf (last visited May 21, 2009). The federal policy authorizes female Muslim inmates to wear a "hijab," and it states that such "[r]eligious headwear is worn throughout the institution." *Id.* The policy is intended to protect "the religious rights of inmates of all faiths" while maintaining "the security and orderly running of the institution." *Id.*

36. In contrast to Defendants' policy, custom, or practice prohibiting the use of religious headcoverings in MCSO jails including the Fourth Avenue Jail, other Sates have, like the Federal Bureau of Prisons, enacted policies regarding religious headwear. The Kentucky Department of Corrections, for example, permits "[s]carves and head

wraps to be authorized for female inmates who have identified a religious preference of Muslim, Jewish, Native American, Rastafarian, and those of the orthodox Christian tradition." This includes the "hijab." Kentucky Corrections, Policies and Procedures, Policy No. 23.1, at 5 (filed Jan. 9, 2007). The New York Department of Correctional Services permits inmates to wear religious headcoverings. Approved religious headcoverings include the "khimar" – a "cloth headcovering (not to cover the face) for female members of the Islamic faith measuring no more than 4 feet by 4 feet." State of New York, Dep't of Correctional Servs., Directive No. 4202, at 6-7 (May 12, 2004, last revised April 24, 2007).

37. The right to practice her religion that Eman sought to exercise, and Defendants' obligations to accommodate her religious needs, were clearly established as of September 24, 2008.

38. By verbally abusing Eman on the basis of her religious beliefs and implying that wearing her headscarf was "un-American," Defendant John Doe acted with malice and with reckless indifference towards Eman's constitutional rights.

39. Through their actions and policies described above, all Defendants demonstrated a callous disregard for the rights and well being of Eman, and on information and belief, are continuing these discriminatory actions against Muslim women detainees.

## CLAIMS FOR RELIEF

### First Claim For Relief

Violation of Religious Land Use and Institutionalized Persons Act

42 U.S.C. §§ 2000cc et seq.

(Against All Defendants)

40. The above paragraphs are hereby incorporated by this reference as though fully set forth here.

41. Under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, "No government shall impose a substantial burden

on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest."

42. By their actions described above, including by requiring Eman to remove her religious headscarf and by prohibiting Eman from covering her head with it, including in the presence of male officers and other inmates, Defendants imposed a substantial burden on Eman's religious exercise in that it forced Eman to violate a fundamental tenet of her faith and a central component of her religious practice. That substantial burden neither furthers a compelling government interest nor is the least restrictive means of furthering a compelling governmental interest.

43. Accordingly, Defendants have violated Eman's rights under RLUIPA.

### Second Claim For Relief

Violation of the First Amendment to the United States Constitution

42 U.S.C. § 1983

(Against All Defendants)

44. The above paragraphs are hereby incorporated by this reference as though fully set forth here.

45. The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

46. By their actions described above, including by forcing Eman to remove her headscarf and by prohibiting Eman from covering her head with it, including in the presence of male officers and other inmates, and allowing religious head coverings to be worn by other detainees, Defendants denied Eman the right to free exercise of religion, as guaranteed by the First Amendment to the Constitution of the United States and incorporated against the States through the Fourteenth Amendment.

**Third Claim For Relief**

Violation of Article 20, Section 1 of the Arizona Constitution

(Against All Defendants)

47.     34.     The above paragraphs are hereby incorporated by this reference as though fully set forth here.

48.     Article 20, Section 1 of the Arizona State Constitution provides: "Perfect toleration of religious sentiment shall be secured to every inhabitant of this state, and no inhabitant of this state shall ever be molested in person or property on account of his or her mode of religious worship . . . ."

49.     By their actions described above, including by forcing Eman to remove her headscarf and by prohibiting Eman from covering her head with it, including in the presence of male officers and other inmates, Defendants denied Eman the right to free exercise of religion, as guaranteed by the Arizona State Constitution.

**Fourth Claim For Relief**

Violation of the Arizona Free Exercise of Religion Act

A.R.S. §§ 41-1493 to 1493.02

(Against All Defendants)

50.     The above paragraphs are hereby incorporated by this reference as though fully set forth here.

51.     Under the Arizona Free Exercise of Religion Act ("FERA"), A.R.S. § 41-1493.01, "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability. . . . Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is both: (1) [i]n furtherance of a compelling governmental interest [and] (2) [t]he least restrictive means of furthering that compelling governmental interest."

52.     By their actions described above, including by requiring Eman to remove her religious headscarf and by prohibiting Eman from covering her head with it,

including in the presence of male officers and other inmates, Defendants imposed a substantial burden on Eman's religious exercise in that it forced Eman to violate a fundamental tenet of her faith and a central component of her religious practice. That substantial burden neither furthers a compelling government interest nor is the least restrictive means of furthering a compelling governmental interest.

53. Accordingly, Defendants have violated Eman's rights under FERA.

**PRAYER FOR RELIEF**

54. Plaintiff Eman A. Mabrouk therefore respectfully requests that the Court enter a judgment, including but not limited to:

    a. Compensatory damages in an amount to be proven at trial;

    c. Punitive damages in an amount to be proven at trial;

    d. Nominal damages;

    e. Costs and reasonable attorneys' fees; and

    f. Such additional and further relief as the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

55. A jury trial is requested on all issues enumerated in the Complaint pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED this 2nd day of June, 2009.

    SNELL & WILMER L.L.P.

    By  /s/ Benjamin M. Mitsuda
    Ronald W. Messerly
    Benjamin M. Mitsuda
    One Arizona Center
    400 E. Van Buren
    Phoenix, AZ 85004-2202

    Daniel J. Pochoda
    ACLU Foundation of Arizona
    P.O. Box 17148
    Phoenix, AZ 85011-0148

    Attorneys for Plaintiff Eman A. Mabrouk